Slip Op. 17-75

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **SOLARWORLD AMERICAS, INC. AND GOAL ZERO, LLC,** | |
| **Plaintiff and Consolidated Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | Before: Claire R. Kelly, Judge |
| **Defendant,** | Consol. Court No. 15-00231 |
| **and** | PUBLIC VERSION |
| **YINGLI GREEN ENERGY HOLDING CO., LTD. ET AL.,** | |
| **Defendant-Intervenors and Consolidated Defendant-Intervenor.** | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination in the first administrative review of the antidumping duty order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.]

Dated: June 28, 2017

Timothy C. Brightbill, Wiley Rein, LLP, of Washington, DC, argued for Plaintiff and Consolidated Defendant-Intervenor SolarWorld Americas, Inc. With him on the brief was Laura El-Sabaawi.

Diana Dimitriuc-Quaia, Arent Fox LLP, of Washington, DC, argued for Consolidated Plaintiff Goal Zero, LLC. With her on the brief were John Marshall Gurley and Aman Kakar.

Tara Kathleen Hogan, Senior Trial Counsel, U.S. Department of Justice, Commercial Litigation Branch – Civil Division, of Washington, DC, argued for defendant.  With her on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director.  Of counsel on the brief were Amanda T. Lee and Mercedes C. Morno, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement & Compliance.

Neil R. Ellis, Sidley Austin, LLP, of Washington, DC, argued for Defendant-Intervenors Yingli Green Energy Holding Co., Ltd., Yingli Green Energy Americas, Inc., Yingli Energy (China) Co., Ltd., Baoding Tianwei Yingli New Energy Resources Co., Ltd., Tianjin Yingli New Energy Resources Co., Ltd., Hengshui Yingli New Energy Resources Co., Ltd., Lixian Yingli New Energy Resources Co., Ltd., Baoding Jiasheng Photovoltaic Technology Co., Ltd., Beijing Tianneng Yingli New Energy Resources Co., Ltd., Hainan Yingli New Energy Resources Co., Ltd., Jinko Solar Import & Export Co., Ltd., and JinkoSolar International Limited, and Jinko Solar Co., Ltd.  With him on the brief were Richard L.A. Weiner, Rajib Pal, Shawn Michael Higgins, and Justin Ross Becker.

Robert George Gosselink, Jarrod Mark Goldfeder, and Jonathan Michael Freed, Trade Pacific, PLLC, of Washington, DC, for Defendant-Intervenors Changzhou Trina Solar Energy Co., Ltd. and Trina Solar (Changzhou) Science & Technology Co., Ltd.

Kelly, Judge:  This action is before the court on USCIT Rule 56.2 motions for judgment on the agency record challenging the U.S. Department of Commerce's ("Department" or "Commerce") determination in the first administrative review of the antidumping duty ("ADD") order covering crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China ("China" or "the PRC"). See SolarWorld's Mot. J. Agency R., Apr. 15, 2016, ECF No. 62; Consolidated Pl. Goal Zero LLC's Rule 56.2 Mot. J. Agency R., Apr. 15, 2016, ECF No. 60-1; Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the [PRC], 80 Fed. Reg. 40,998 (Dep't Commerce July 14, 2015) (final results of ADD administrative review and final determination of no shipments; 2012–2013) ("Final Results") and accompanying Decision Memorandum for the Final Results of the 2012–2013 [ADD] Administrative

Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the [PRC], Sept. 16, 2015, ECF No. 20-5 ("Final Decision Memo").

Plaintiff, SolarWorld Americas, Inc. ("SolarWorld"), commenced this action pursuant to section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012).[1] See Summons, Aug. 12, 2015, ECF No. 1. The action was consolidated with an action filed by Goal Zero, LLC ("Goal Zero"), which challenges aspects of the same determination.[2] See Order, Nov. 3, 2015, ECF No. 39.

Goal Zero challenges on several grounds Commerce's application of the China-wide rate of 249.96 percent to ERA Solar Co., Ltd. ("ERA Solar"), the exporter of subject merchandise imported by Goal Zero. See Consolidated Pl. Goal Zero LLC's Br. Supp. Rule 56.2 Mot. J. Agency R. Final Confidential Version, Apr. 15, 2016, ECF No. 59 ("Goal Zero Br."). First, Goal Zero argues that Commerce's presumption that Chinese companies are subject to government control is contrary to law. See id. at 10–19. Second, Goal Zero challenges the assignment of an ADD rate based on adverse facts

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[2] The court initially consolidated this action with an action filed by Yingli Green Energy Holding Co., Ltd., Yingli Green Energy Americas, Inc., Yingli Energy (China) Co., Ltd., Baoding Tianwei Yingli New Energy Resources Co., Ltd., Tianjin Yingli New Energy Resources Co., Ltd., Hengshui Yingli New Energy Resources Co., Ltd., Baoding Jiasheng Photovoltaic Technology Co., Ltd., Beijing Tianneng Yingli New Energy Resources Co., Ltd., Hainan Yingli New Energy Resources Co., Ltd., and Lixian Yingli New Energy Resources Co., Ltd., filed in Yingli Green Energy Holding Co., Ltd. et al. v. United States, Court No. 15-00222. See Order, Nov. 3, 2015, ECF No. 39. However, after a consent motion to sever Yingli Green Energy Holding Co., Ltd. et al. v. United States, Court No. 15-00222, the court severed that case from this consolidated case on April 8, 2016. See Order, Apr. 8, 2016, ECF No. 56.

available ("AFA")[3] to ERA Solar, arguing that Commerce improperly imputes non-cooperation to ERA Solar without record evidence.  See id. at 19–25.  Third, Goal Zero challenges as uncorroborated the AFA rate assigned to the China-wide entity.  See id. at 26–38.

SolarWorld challenges four aspects of Commerce's final determination.  See SolarWorld Americas Inc.'s Mem. Supp. Rule 56.2 Mot. J. Agency R. Revised Confidential Version, Apr. 15, 2016, ECF No. 61 ("SolarWorld Br.").  First, SolarWorld challenges Commerce's selection of surrogate value import data for two inputs (steel frames and semi-finished polysilicon ingots and blocks) used in the production of subject merchandise.  See id. at 14–24.  Second, SolarWorld questions Commerce's decision to include a line item identified as "other income" in its surrogate financial ratio calculation. See id. at 42–44.  Third, SolarWorld challenges Commerce's inclusion of sales made by mandatory respondent Wuxi Suntech Power Co., Ltd. ("Suntech") to an affiliated company in the United States as constructed export price ("CEP") sales when calculating Suntech's dumping margin.  See id. at 29–33.  In relation to this challenge, SolarWorld also claims that Commerce should have determined the date of sale for Suntech's reported sales to its affiliate based on the date the contract was initially executed.  See id. at 33–39.  Fourth,

---

[3] Although 19 U.S.C. § 1677e(a)–(b) and 19 C.F.R. § 351.308(a)–(c) (2014) each separately provide for the use of facts otherwise available and the subsequent application of adverse inferences to those facts, Commerce uses the shorthand "adverse facts available" or "AFA" to refer to its use of such facts otherwise available with an adverse inference.  See, e.g., Final Decision Memo at 13–19.

SolarWorld contests Commerce's use of factors of production ("FOP") usage data from Suntech and certain tollers.  See id. at 39–42.

For the reasons that follow, the court sustains Commerce's application of the China-wide AFA rate of 249.96 percent to ERA Solar as supported by substantial evidence and in accordance with law, Commerce's surrogate value data selections to value solar frames and semi-finished silicon ingots and blocks, Commerce's inclusion of the "other income" line item in its surrogate financial profit calculation, the inclusion of sales to Suntech as CEP sales, and Commerce's acceptance of FOP usage data from Suntech and certain tollers as facts available.  However, the court remands for further explanation or reconsideration consistent with this opinion Commerce's determination to use the date of shipment rather than the date of contract for Suntech's sales to its affiliate.

## BACKGROUND

On February 3, 2014, Commerce initiated the first administrative review of the ADD order on crystalline silicon photovoltaic cells, whether or not assembled into modules, from China.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the [PRC], 79 Fed. Reg. 6,147 (Dep't Commerce Feb. 3, 2014) (initiation of antidumping and countervailing duty administrative reviews and request for revocation in part).  Commerce selected Yingli Energy (China) Company Limited ("Yingli") and Suntech as mandatory respondents in this review.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the [PRC], 80 Fed. Reg. 1,021 (Dep't Commerce Jan. 8, 2015) (preliminary results of ADD administrative review and preliminary determination of no shipments; 2012–2013) ("Prelim. Results").  To calculate

a surrogate value ("SV") for Yingli's aluminum frames, Commerce preliminarily used import data corresponding to Thai Harmonized Tariff System ("HTS") heading 7604. Decision Memorandum for the Preliminary Results of the 2012–2013 [ADD] Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the [PRC] at 1, PD 513, bar code 3250265-01 (Dec. 31, 2014) ("Prelim. Decision Memo").   Commerce used the world price for polysilicon to calculate a SV for semi-finished ingots and blocks purchased by Yingli in the production of subject merchandise.  Id. at 2–3.  Commerce also preliminarily excluded a line item labeled "other income" from the surrogate profit ratio calculation.   See [ADD] Administrative Review of Crystalline Silicon Photovoltaic Cells from the [PRC]: Factor Valuation Memo, A-570-979, 9, Attach. V, PD 530, bar code 3252163-01 (Dec. 31, 2014). Commerce preliminarily assigned Yingli Energy (China) Company Limited a rate of 1.82 percent.  See Prelim Results, 80 Fed. Reg. at 1,023.  Commerce preliminarily assigned Suntech the China-wide rate of 238.56 percent, id. at 1,023 n.11, because Commerce determined Suntech and entities with which it was collapsed had not demonstrated an absence of de facto government control over export activities.  Prelim. Decision Memo at 14.

Commerce preliminarily determined that ERA Solar did not establish eligibility for a separate rate because ERA Solar did not submit a separate rate application.  See Prelim. Decision Memo at 15.  Further, because certain entities did not respond to Commerce's request for quantity and value ("Q&V") information, Commerce determined that the China-wide entity failed to cooperate to the best of its ability.  Prelim. Results, 80

Fed. Reg. at 1,022, 1,023 n.11.   Accordingly, Commerce preliminarily assigned ERA

Solar the AFA rate of 238.56 percent assigned to the China-wide entity, id., which is a

dumping margin from the petition.[4]   See Prelim. Decision Memo at 36.

In its final results, Commerce continued to use import data under Thai HTS

heading 7604 to value Yingli's aluminum frames inputs.   Final Decision Memo at 76, 81–

84.   Commerce also continued to use the world price for polysilicon to obtain a SV for

semi-finished ingots and blocks.   See id. at 76.   Commerce determined that the "other

income" line item that had been preliminarily excluded from its surrogate financial profit

ratio calculation should be included in surrogate financial profit for the final results.   See

id. at 60.   To calculate the amount of certain FOPs consumed in the production of subject

merchandise, Commerce used FOP data on the record from Suntech and from certain

unaffiliated tollers that supplied FOP usage data as a substitute for missing FOP usage

data of other unaffiliated tollers who had not provided usage information.   See id. at 40–

41.   Commerce included sales reported by Suntech to its affiliate as CEP sales, because

Commerce found that the reported sales price from Suntech to its affiliate was the same

price as the price the affiliate sold the merchandise to the first unaffiliated party.   See id.

at 91–94.   To determine the date of sale of Suntech's U.S. sales in order to ensure a

temporal nexus between home market sales and U.S. sales for Commerce's margin

---

[4] As it had done in the preliminary determination, Commerce calculated the final effective China-wide entity rate of 238.56 percent by offsetting the final China-wide ADD rate of 249.96 percent by the amount of export subsidies and estimated domestic subsidy pass-through, as directed by the statute.   Final Results, 80 Fed. Reg. at 41,001 n.50; see also 19 U.S.C. § 1677a(c)(1)(C) (providing that the price used to establish export price and CEP in a review shall be increased by "the amount of any countervailing duty imposed on the subject merchandise . . . to offset an export subsidy").

calculation, Commerce used the date of shipment because Commerce determined that the prices in Suntech's contracts for sale of subject merchandise can change after the original contract is executed. Id. at 93.  These changes resulted in Commerce assigning a 33.08 percent margin to mandatory respondent Suntech and a de minimis margin to Yingli. Final Results, 80 Fed. Reg. at 41,001.  Commerce also continued to find that ERA Solar was ineligible for a separate rate.  Final Decision Memo at 11–12.  Commerce assigned the China-wide entity, including ERA Solar, a rate of 238.95 percent.  Final Results, 80 Fed. Reg. at 41,002, 41,002 n.49.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an administrative review of an antidumping duty order.  "The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.  Commerce's Application of AFA to Goal Zero

Goal Zero challenges Commerce's application of the non-market economy ("NME") presumption to ERA Solar, Goal Zero's exporter, as unsupported by substantial evidence.  See Goal Zero Br. 10–19.  Further, Goal Zero argues that the application of a China-wide rate based on AFA is contrary to law and unsupported by substantial evidence. See id. at 19–25.  Lastly, Goal Zero challenges the AFA rate assigned to the

China-wide entity as contrary to law and unsupported by substantial evidence because it

is uncorroborated.  See id. at 26–38.  The court addresses each challenge in turn.

### A. Application of the NME Presumption

Goal Zero argues that Commerce's application of a rebuttable presumption that all

respondents are government controlled is contrary to law because it is inconsistent with

Commerce's findings in countervailing duty ("CVD") proceedings that market-oriented

reforms render many companies' export activities independent of the Chinese

government.  See Goal Zero Br. 10–15.  Defendant responds that the court should decline

to decide this issue because Goal Zero failed to exhaust this issue at the administrative

level.  Def.'s Mem. Opp'n Pls.' Rule 56.2 Mots. J. Upon Agency R. Confidential Version

9–10, Dec. 14, 2016, ECF No. 80 ("Def.'s Resp. Br.").  Defendant argues that, even if

Goal Zero exhausted its administrative remedies, Commerce's application is consistent

with its longstanding practice and supported by substantial evidence.  Id. at 10–17.  The

court first addresses Defendant's exhaustion argument.  Thereafter, the court proceeds

to address the legal bases for Commerce's application of the NME presumption to ERA

Solar.

### 1. Exhaustion of Administrative Remedies

Defendant argues that Goal Zero failed to exhaust its administrative remedies.

Def.'s Resp. Br. 9–10.  Goal Zero responds that its challenge should be reviewed by the

court because other parties raised and extensively briefed the challenge to Commerce's

NME presumption at the administrative level.  Reply Br. Consolidated Pl. Goal Zero, LLC

Confidential Version 2–7, Feb. 16, 2017, ECF No. 100 ("Goal Zero Reply Br.").  The court

reaches Goal Zero's challenge to the NME presumption because Commerce had ample

opportunity to address the arguments supporting this challenge.

Congress has directed that the Court "shall, where appropriate, require the

exhaustion of administrative remedies."   28 U.S.C. § 2637(d).   Although the statute

requires that parties exhaust their remedies before the pertinent administrative agencies,

it also allows the court some degree of discretion to consider circumstances where a strict

application of the rule may be inappropriate.  See 28 U.S.C. § 2637(d); see also Corus

Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (stating that the Court

should ordinarily insist that parties exhaust their remedies before the pertinent agency,

but the statutory injunction is not absolute).  The overarching purpose of the exhaustion

doctrine is to "allow[] the agency to apply its expertise, rectify administrative mistakes,

and compile a record adequate for judicial review–advancing the twin purposes of

protecting administrative agency authority and promoting judicial efficiency."  Carpenter

Tech. Corp. v. United States, 30 CIT 1373, 1374–75, 452 F. Supp. 2d 1344, 1346 (2006)

(citing Woodford v. Ngo, 548 U.S. 81, 88–90 (2006)).

Here, Commerce had sufficient opportunity to address the legal viability of the

NME presumption and its applicability in this proceeding in its final determination because

Suntech's brief before the agency raised the same issues.[5]  See Case Brief of Wuxi

---

[5] Specifically, Suntech argued before Commerce that Commerce's practice of presuming government control of entities operating in NMEs should be abandoned because the presumption is inconsistent with its determination that subsidies are identifiable and measurable in cases involving China.  See Case Brief of Wuxi Suntech Power Co., Ltd. at 6, CD 577, bar code

(footnote continued)

Suntech Power Co., Ltd. at 6–12, CD 577, bar code 3275378-01 (May 8, 2015).  Indeed,

Commerce squarely addressed these arguments, which are materially identical to those

raised by Goal Zero here, in its final determination.[6]  See Final Decision Memo at 98–

101.  Commerce had ample opportunity to apply its expertise, address any errors made

at the administrative level, and develop a record upon which to ensure adequate judicial

review.

### 2.  Commerce's Application of the NME Presumption to ERA Solar

Goal Zero contends that Commerce's application of the NME presumption is

unsupported by substantial evidence because the presumption is outdated and

inconsistent with Commerce's recent findings that the Chinese economy is not composed

of a single economic entity.[7]  See Goal Zero Br. 10–15.  Defendant responds that the

---

3275378-01 (May 8, 2015).  Suntech also explicitly argued that this aspect of Commerce's separate rate practice was at odds with Commerce's findings in CVD proceedings regarding economic and legal reforms made in the Chinese economy that made the Chinese economy significantly different than when Commerce first implemented its separate rate practice.  See id. at 7–9.  Further, Suntech contended before Commerce that the findings on which Commerce relied to support the application of CVD law to NME entities directly contravenes the assumptions about the Chinese economy underlying the NME presumption.  See id. at 9–12.

[6] Commerce cited precedent that it is within Commerce's authority to employ a presumption for state control in a NME country and to place the burden on exporters to demonstrate an absence of government control.  See Final Decision Memo at 98 (citing Sigma Corp. v. United States, 117 F.3d 1401, 1405–06 (Fed. Cir. 1997)).  Further, Commerce distinguished the concept of the "NME-wide entity" for ADD purposes from the "single economic entity" concept discussed in Commerce's treatment of NMEs in the CVD context.  See id. at 99–100.  Specifically, Commerce explained that the NME presumption does not stem from an economy comprised of the government, but rather from "the NME-government's use of a variety of legal and administrative levers to exert influence and control (both direct and indirect) over the assembly of economic actors across the economy."  Id. at 100.

[7] By practice, Commerce employs a presumption of government control for NME-based exporters.  See, e.g., Final Decision Memo at 98.  As a result of this presumption, Commerce assigns all exporters of merchandise subject to review in a NME country a single rate unless an exporter can "demonstrate an absence of central government control."  See id.

NME presumption is in accordance with law and that Commerce's findings that the NME presumption should be applied to ERA Solar are not inconsistent with Commerce's findings that CVD law is applicable to China. Def.'s Resp. Br. 17–22. The court agrees with the Defendant.

A NME country is defined in the statute as "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). The statute provides a non-exhaustive list of factors for Commerce to take into account in determining whether a country is a NME country. See 19 U.S.C. § 1677(18)(B)(i)–(vi). Once Commerce determines that a country is a nonmarket economy, that determination shall remain in effect until revoked.[8] See 19 U.S.C. § 1677(18)(C). In cases involving imports from a NME country, Commerce's regulations permit it to calculate a single dumping margin applicable to all exporters and producers that are not individually examined. See 19 C.F.R. § 351.107(d) (2014).[9] Nothing in the statute requires that Commerce determine that exporters operating within a NME country may or may not operate freely of government control. Commerce acts within its discretion to develop a reasonable methodology for determining whether an exporter operates independently of government control in a NME country. Therefore, it is not unreasonable for Commerce to presume government control of an exporter in a NME country.

---

[8] Neither the statute nor Commerce's regulations defines procedures for Commerce to determine whether a country is a NME country.

[9] Further citations to Title 19 of the Code of Federal Regulations are to the 2014 edition.

Commerce's practice requires that a party's separate rate status be established in each segment of the proceeding in which the party is involved because a company's corporate structure, ownership, or relationship with the government may change from one segment of a proceeding to the next.   Final Decision Memo at 13 (citing Wooden Bedroom Furniture from the [PRC]: Issues and Decision Memorandum for the Final Results of Review,   A-570-890,   7   (Jun.   5,   2013),   <u>available   at</u> http://ia.ita.doc.gov/frn/summary/prc/2013-13987-1.pdf (last visited Jun. 23, 2017)).

Here, Commerce justified the continued viability of the NME presumption on the grounds that it reasonably determines that governments may "use a variety of legal and administrative levers to exert influence and control (both direct and indirect) over the assembly of economic actors across the economy" even where the economy is not comprised entirely of the government.  <u>See</u> Final Decision Memo at 100.  Goal Zero points to no reason why it is unreasonable to conclude that an entity could be controlled by the government where the government does not comprise the entire economy.  Commerce reasonably explains why its presumption that an exporter in a NME country is benefiting from government control is compatible with its finding that the Chinese economy has undergone reforms to eliminate the government as a single central authority comprising the entire economy.

Goal Zero argues that Commerce's NME presumption of state control is unreasonable in light of Commerce's findings that changes in the Chinese economy have left Chinese respondents with "'the discretion to change [their] export and/or production decisions.'"  <u>See</u> Goal Zero Br. 11–14 (quoting Issues and Decision Memorandum for the

Antidumping Investigation of Certain New Pneumatic Off-the-Road Tires from the [PRC],

A-570-912, 10 (July 7, 2008), <u>available at</u> http://ia.ita.doc.gov/frn/summary/prc/E8-16156-

1.pdf (last visited Jun. 23, 2017)).  Further, Goal Zero cites Commerce's recognition that

more companies' export activities in China are independent from the government in

comparison to the early to mid-1990s.[10]  <u>Id.</u> at 11–12.  However, Commerce explains that

the NME presumption does not stem from a determination that individual companies

operating within a NME country are government entities, but rather that the NME-

government can exert influence over economic actors in such an economy.  <u>See</u> Final

Decision Memo at 100.   Commerce's practice allows a respondent to prove its

independence from the government by means of a separate rate application, and it is

reasonable to place the burden on a respondent to prove its independence from

government control even where economic and legal reforms have progressed to a point

where some firms operate freely of government control.[11]

---

[10] Goal Zero notes that a recent World Trade Organization ("WTO") panel decision has found that the NME presumption employed by Commerce is inconsistent with the WTO Antidumping Agreement.  Goal Zero Reply Br. 9 (citing Panel Report, <u>United States-Certain Methodologies and Their Application to Anti-Dumping Proceedings Involving China</u>, WTO Doc. WT/DS741/R, ¶ 3.1.d (2016), <u>available at</u> https://www.wto.org/english/tratop_e/dispu_e/471r_e.pdf (last visited Jun. 23, 2017) ("<u>US-AD Methodologies (China)</u>")).  However, WTO decisions "are not binding on the United States."  <u>Corus Staal BV v. Dep't of Commerce</u>, 395 F.3d 1343, 1348–49 (Fed. Cir. 2005).  Moreover, although Goal Zero claims that the United States has not appealed the panel decision and indicated it will implement the panel's decision, <u>see</u> Goal Zero Br. 12, it is unclear what steps the United States has undertaken thus far to adopt and implement the <u>US-AD Methodologies (China)</u>.  Congress has enacted legislation on if and how to implement WTO decisions.  <u>See Corus Staal</u>, 395 F.3d at 1349; <u>see also</u> 19 U.S.C. §§ 3353(f), (g) (providing procedures to adopt and implement WTO decisions into United States law).

[11] Goal Zero's separate point that Commerce's NME presumption in ADD proceedings is arbitrary because it simultaneously treats ERA Solar as government-controlled in the ADD proceeding

(footnote continued)

### B. Assignment of China-Wide Rate to ERA Solar

Goal Zero claims that Commerce's assignment of the China-wide rate to ERA Solar on the basis that it is government-controlled is unsupported by substantial evidence. Goal Zero Br. 16–19. Defendant counters that Commerce's determination to include ERA Solar within the China-wide entity is supported by substantial evidence because ERA Solar failed to put forth any evidence supporting its eligibility for a separate rate. Def.'s Resp. Br. 17–22. The court agrees with Defendant. Commerce's assignment of the China-wide rate to ERA Solar is supported by substantial evidence.

As already discussed, Commerce's regulations permit it to calculate a single dumping margin applicable to all exporters and producers that are not individually examined in cases involving a NME country. See 19 C.F.R. § 351.107(d). Here, Goal Zero does not dispute Commerce's finding that ERA Solar did not meet its burden to demonstrate independence from state control because it did not submit a separate rate application in this administrative review. See Final Decision Memo at 11; Goal Zero Br. 18. Because ERA Solar failed to submit any separate rate documentation, Commerce determined that ERA Solar did not qualify for a separate rate. Final Decision Memo at

---

while treating the company as independent of government control in the CVD proceeding, see Goal Zero Br. 14–15, stems from the same flawed understanding of the premise for Commerce's decision to apply CVD law to China. Commerce treats ADD and CVD proceedings differently because of the different nature of the inquiry in ADD and CVD proceedings. It is reasonably discernible that Commerce applies the NME presumption in ADD proceedings and evaluates the bestowals of countervailable subsidies precisely because reforms are uneven and some economic actors do not take advantage of the legal and administrative levers the NME-government may use to exert influence and control. See Final Decision Memo at 100. Accordingly, as already discussed, Goal Zero's contention that Commerce's presumption is called into question by its own findings regarding the application of CVD law in China are misplaced.

11.  Commerce would not excuse ERA Solar's failure to submit separate rate information because Commerce reasonably determined that ERA Solar had notice that it was subject to the review.[12]  Id. at 12.

Goal Zero argues that it is unreasonable to presume that ERA Solar is government-controlled for this review where Commerce preliminarily recognized ERA Solar's entitlement to a separate rate in the second administrative review of this same order and in the companion CVD administrative review.  See Goal Zero Br. 18–19. Commerce explained that the agency cannot rely on a party's separate rate eligibility in one segment of a proceeding as evidence of eligibility in a prior or subsequent segment. Final Decision Memo at 13 ("[A] party's separate rate status must be established in each segment of the proceeding in which the party is involved because a company's corporate structure, ownership, or relationship with the government can change from one segment of a proceeding to the next.").  Although Goal Zero claims that no such changes to ERA Solar's corporate structure actually occurred from the investigation to the second period of review, see Goal Zero Br. 19, it is reasonably discernible that Commerce relies upon the record of each proceeding because it is not burdensome for a company, which is in the best position to produce such information, to provide such information in each segment.  See Final Decision Memo at 13.  Based upon the record here, Commerce's

---

[12] Further, Commerce noted that ERA Solar had participated and received a separate rate in the investigation of this proceeding.  See Final Decision Memo at 13.

determination to deny separate rate status based upon ERA Solar's failure to submit a

separate rate certification is supported by substantial evidence.[13]

### C. Application of AFA to the China-Wide Entity

Goal Zero argues that, in applying an adverse inference, Commerce unreasonably

imputed non-cooperation to all members of the NME entity when most of the respondents

fully cooperated.  Goal Zero Br. 20–25.  Defendant responds that Commerce reasonably

applied AFA to determine the China-wide rate because Commerce determined that the

China-wide entity failed to cooperate by acting to the best of its ability, because PRC

exporters or producers that are part of the China-wide entity failed to respond to quantity

and volume ("Q&V") questionnaires.  Def.'s Resp. Br. 24–26.  Commerce's application of

---

[13] Goal Zero claims that case law requires Commerce to look to preceding and future reviews for guidance to determine whether ERA Solar is government-controlled.  See Goal Zero Br. 18–19 (citing Calgon Carbon Corp. v. United States, 40 CIT __, __, 145 F. Supp. 3d 1312, 1322 n.11 (2016)).    However, in Calgon, the court held that Commerce's determination to deny the respondent a separate rate status was unsupported by substantial evidence because Commerce had not addressed respondent's arguments challenging the basis for the presumption of state control.  See Calgon, 40 CIT at __, 145 F. Supp. 3d at 1322.  The court made clear that it did not intend the holding to apply in a context where Commerce had provided substantive arguments supporting the NME presumption, stating that "[t]his is not to say that, in a future review or in another case, Commerce could not make the proper showing to justify its continued presumption of state control even in contemporary circumstances."  Id.  The court merely drew attention to the fact that the respondent had been designated for separate rate status in the preceding and subsequent reviews to support its determination that Commerce's denial was not supported by substantial evidence.  See id.  The court did not hold or suggest that Commerce must look to a party's separate rate status in a prior or subsequent proceeding.  See id.

Goal Zero also implies that Commerce has a practice of looking to future reviews for guidance in making determinations about an exporter's entitlement to a separate rate where there is no evidence on the record in the administrative review at issue.  Goal Zero Br. 18–19 (citing Changzhou Hawd Flooring Co., Ltd. v. United States, 39 CIT __, __, 44 F. Supp. 3d 1376, 1386 (2015)).  However, the case cited by Goal Zero does not establish any such practice.  In Changzhou Hawd, Commerce did not look to prior or future segments of the proceeding to determine an exporter's entitlement for a separate rate, but rather corroborated the inference of a more than de minimis separate rate with citation to the results of a future review.  See Changzhou Hawd Flooring Co., Ltd., 39 CIT at __, 44 F. Supp. 3d at 1386.

an AFA rate to the China-wide entity is in accordance with law and supported by substantial evidence.

Commerce shall use "facts otherwise available in reaching the applicable determination" when a respondent: (1) withholds information that has been requested by Commerce; (2) fails to provide such information by Commerce's deadlines for submission of the information or in the form and manner requested; (3) significantly impedes an antidumping proceeding; or (4) provides information that cannot be verified.  19 U.S.C. § 1677e(a)(2).  Commerce may apply an adverse inference in choosing among facts available if the respondent's failure to act to the best of its ability to comply with Commerce's request for information caused the deficiency.  19 U.S.C. § 1677e(b); see also Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003).

Here, Commerce justified its determination to apply AFA to the China-wide entity because Chinese exporters of subject merchandise during the POR that are part of the China-wide entity did not respond to Commerce's Q&V questionnaires.[14]  See Final Decision Memo at 15; Prelim. Decision Memo at 17.  Goal Zero offers no record evidence to detract from Commerce's finding that these companies withheld requested information and, therefore, failed to act to the best of their ability.  Therefore, Commerce's determination that the China-wide entity failed to cooperate by acting to the best of its ability is in accordance with law and supported by substantial evidence.

---

[14] Commerce noted that it received Q&V responses from 27 companies.  Prelim. Decision Memo at 2.  However, Commerce found that "[o]nly 19 of the 23 companies to which [it] sent a Q&V questionnaire responded to the questionnaire."  Id. at 2 n.3.

Goal Zero further argues that Commerce lacked substantial evidence to determine that the China-wide entity failed to cooperate to the best of its ability because only two companies for which Commerce completed the review did not respond to its Q&V questionnaires.  Goal Zero Br. 22–23.  However, the statute only requires that Commerce assess the extent of the China-wide entity's abilities, efforts, and cooperation.  See Nippon Steel, 337 F.3d at 1382.[15]  Although Commerce could conceivably have taken the extent to which individual members of the China-wide entity cooperated with its requests into account, nothing in the statute requires it to make such an individualized inquiry of respondents that are part of the China-wide entity.[16]  Commerce found some respondents that were sent Q&V questionnaires failed to provide information that they reasonably

---

[15] The statute requires Commerce to first "make an objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained."  Nippon Steel, 337 F.3d at 1382.  Second, Commerce must make a subjective showing that the respondent's failure to respond is the result of the respondent's lack of cooperation in either: "(a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records."  Id.; see 19 U.S.C. § 1677e(b).

[16] Goal Zero claims that Commerce has a practice of adjusting the China-wide rate to reflect past cooperation by a respondent that has previously been granted a separate rate in other segments of the same proceeding.  Goal Zero Br. 25 (citing Diamond Sawblades Manufacturers' Coalition v. United States, 39 CIT __, 2015 WL 5603898 at *8 (2015)).  However, the facts here are sufficiently distinguishable from those in Diamond Sawblades to reasonably justify Commerce's exercise of its discretion to apply AFA to the China-wide entity despite the cooperation of certain members of the China-wide entity.  In Diamond Sawblades, Commerce initially determined the China-wide rate based on AFA at a time when a certain company and its affiliates were not part of the China-wide entity (and had been granted a separate rate).  See Diamond Sawblades, 39 CIT at __, 2015 WL 5603898 at *1.  On remand, Commerce determined that entity was not entitled to a separate rate and that the China-wide rate should take into account the inclusion of that entity.  See id.  In the instant case, the China-wide rate was never calculated based upon the extent of cooperation or data of different respondents because Commerce calculated the rate from the outset based upon ERA Solar's non-cooperation.  See Final Decision Memo at 15.

could have been expected to maintain.[17]  <u>See</u> Final Decision Memo at 15.  Therefore,

Commerce's determination that the China-wide entity as a whole failed to cooperate to

the best of its ability is supported by substantial evidence.[18]

### D.  Selection and Corroboration of the China-Wide Rate

Goal Zero argues that Commerce's selection of the 249.96 percent rate as the

AFA rate is unsupported by substantial evidence because it is not sufficiently

corroborated, as required by the statute.  Goal Zero Br. 26–38.  Defendant responds that

Commerce selected the highest rate in the history of the proceeding and corroborated its

rate by comparing the petition margins to the margins calculated for the individually

examined respondents to determine their probative value.    Def.'s Resp. Br. 29.

Commerce's selection of an AFA rate is in accordance with its practice and it is

adequately corroborated.  Therefore, Commerce's selection of an AFA rate for the China-

wide entity is supported by substantial evidence and in accordance with law.

---

[17] Goal Zero argues that it is unreasonable for Commerce to conclude that the NME entity was uncooperative, where there was no evidence or explanation on the record of the impact that the absence of the Q&V responses had on Commerce's conduct of its administrative review.  <u>See</u> Goal Zero Br. 22–24.   Goal Zero points out that "[[

]]."  <u>Id.</u> at 23 (citing Release of Customs and Border Protection Data, CD 7, bar code 3179850-01 (Feb. 10. 2014)).  Therefore, Goal Zero claims that the lack of a Q&V response did not have the potential to distort the pool of respondents or to affect Commerce's margin calculations. <u>Id.</u> at 24.  However, Goal Zero points to nothing in the statute requiring Commerce to consider the effect of the missing information or requiring Commerce to explain why information requested is relevant to its determination.

[18] Commerce gives all respondents an ability to establish independence from government control through its separate rate practice.  It is not unreasonable for Commerce to evaluate the conduct of the China-wide entity as a whole given that these parties failed to preserve their entitlement to individualized inquiry.  Goal Zero points to nothing in the statute that requires Commerce to evaluate the conduct of each individual member of the China-wide entity to assess whether the China-wide entity cooperated to the best of its ability.

Commerce may rely on information from several sources in selecting an AFA rate, including: (1) the petition; (2) the final determination in the investigation; (3) any previous administrative review; or (4) any other information placed on the record. 19 U.S.C. § 1677e(b); see 19 C.F.R. § 351.308(c) (mirroring the statute's directives regarding the sources Commerce may rely upon when selecting an AFA rate). When Commerce uses secondary information, it must, to the extent practicable, corroborate the rate with independent sources that are reasonably at its disposal. 19 U.S.C. § 1677e(c). Commerce's regulation refers to "secondary information" as information derived from: (1) the petition; (2) a final determination in a CVD investigation or an ADD investigation; (3) any previous administrative review, new shipper review, expedited antidumping review, section 753 review, or section 762 review, 19 C.F.R. § 351.308(c)(1)(i)–(iii), and defines the corroboration requirement as providing that Commerce "examine whether secondary information to be used has probative value." 19 C.F.R. § 351.308(d). However, Commerce's regulation explicitly states that the fact that information may not be practicably corroborated "will not prevent [Commerce] from applying an adverse inference as appropriate and using the secondary information in question." Id.

Here, Commerce referenced its finding in the investigation that the price and normal value used to derive the highest margin contained in the petition were within the range of the U.S. prices and normal values for the respondents in the investigation.[19]

---

[19] Commerce selected the highest calculated rate applied in the history of the proceeding that could be corroborated pursuant to its practice of selecting an AFA rate that is sufficiently adverse to induce respondent compliance and to ensure that a party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully. Final Decision Memo at 15.

Final Decision Memo at 16 (citing Crystalline Silicon Photovoltaic Cells, Whether or Not

Assembled Into Modules, From the [PRC], 77 Fed. Reg. 31,309, 31,318 (Dep't

Commerce May 25, 2012) (preliminary determination of sales at less than fair value,

postponement of final determination and affirmative preliminary determination of critical

circumstances); Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into

Modules, From the [PRC], 77 Fed. Reg. 63,791, 63,795 (Dep't Commerce Oct. 17, 2012)

(final determination of sales at less than fair value, and affirmative final determination of

critical circumstances, in part)).   Commerce also compared the 249.96 percent rate

applied to the China-wide entity here to the margins calculated for individually examined

respondents, and determined that the margins fall within the range of Suntech's

calculated weighted average dumping margins from this review.[20]  Final Decision Memo

at 17.   Commerce noted that several margins calculated for Suntech's sales were

"significantly above" the AFA rate applied here and that many more were at a similar level.

Id.  Goal Zero points to no data on the record that undermines Commerce's conclusions

that the margins calculated for some of Suntech's sales are at a similar level or above the

selected AFA rate.  Therefore, Commerce corroborated the China-wide rate to the extent

---

[20] Defendant and Commerce asserted that, having already corroborated the AFA rate in the investigation, the burden for triggering any corroboration requirement was on Goal Zero to call into question the probative value of the rate.  Def.'s Resp. Br. 31; Final Decision Memo at 17. Defendant and Commerce further asserted that the corroboration of the rate in the investigation satisfied the corroboration requirement in the absence of data questioning the probative value of the rate from the investigation.  See Def.'s Resp. Br. 31; Final Decision Memo at 17.  Nonetheless, Commerce corroborated the rate in this review by reference to several margins calculated for Suntech which are significantly above the 249.96 percent and many other margins at a similar level to the margin assigned to the China-wide entity.  See Final Decision Memo at 17.  As a result, the court need not address Defendant's and Commerce's assertions concerning whether the rate must be corroborated by considering information specifically concerning this review.

practicable by finding that the China-wide rate was within the range of the margins applicable to respondents from both the investigation and this review, which were calculated from sources allowed by regulation to corroborate secondary information.  See 19 C.F.R. § 351.308(c)(1)(i)–(iii).

Goal Zero argues that Commerce lacked substantial evidence to conclude that the 249.96 percent rate in the investigation is corroborated because the AFA rate is disproportionately high relative to the calculated rates for any party whose rates were individually calculated.  See Goal Zero Br. 31–32.  However, Commerce enjoys broad discretion to develop a methodology for calculating an AFA rate so long as the rate is corroborated.  See 19 U.S.C. §§ 1677e(b),(c).  Goal Zero points to no information on the record calling into doubt Commerce's corroboration of the rate as applied to the China-wide entity.[21]  Moreover, none of the authority relied upon by Goal Zero requires that the AFA rate selected for the China-wide entity reflect commercial reality of individually investigated respondents.[22]

---

[21] Goal Zero questions why Commerce relies upon Suntech's data to the exclusion of data for other individually investigated respondents to corroborate the China-wide rate.  See Goal Zero Br. 33.  Further, Goal Zero claims that Commerce's final margin analysis of Suntech reveals that there were only [[                                                      ]] the 249.96 percent petition rate.  Id. (citing Analysis of the Final Results of Administrative Review Margin Calculation for Wuxi Suntech Power Co., Ltd. at Attach. I, CD 606, bar code 3290605-01 (July 13, 2015)).  However, Goal Zero points to no authority requiring Commerce to find that all individually examined respondents had margins close to the AFA rate selected where Commerce uses AFA to calculate a rate.

[22] Goal Zero's reliance on Gallant Ocean (Thailand) Co., Ltd. v. United States, 602 F.3d 1319, 1324–25 (Fed. Cir. 2010), see Goal Zero Br. 31–32, is misplaced.  In Gallant Ocean, the Court of Appeals for the Federal Circuit held that Commerce imposed an unreasonably high rate on a

(footnote continued)

Lastly, Goal Zero argues that the petition rate used by Commerce to corroborate the rate applied to the China-wide entity is unreliable because it is based on different methodologies than those used by Commerce in the investigation and administrative review, including different primary surrogate countries and values for certain key inputs. See Goal Zero Br. 36–38.  However, Goal Zero failed to exhaust its administrative remedies because it did not raise these arguments before Commerce.[23]  See Case Brief of Goal Zero, LLC, PD 568, bar code 3265921-01 (Mar. 23, 2015) ("Goal Zero Adm. Case Br.").  None of the arguments raised by Goal Zero before the agency implicate the

---

separate rate respondent because the rate did not reflect commercial reality as it was more than ten times higher than the average dumping margin for cooperating respondents.  Gallant Ocean, 602 F.3d at 1324.  In contrast, here Commerce is corroborating the China-wide rate, not a rate applied to respondents that qualified for a separate rate.  See Final Decision Memo at 15.  Gallant Ocean does not require that the rate assigned to the China-wide entity be a reasonably accurate estimate of the rate established for cooperating respondents.  See Gallant Ocean, 602 F.3d at 1324–25.

Likewise, Goal Zero's reliance on Papierfabrik August Koehler SE v. United States, 843 F.3d 1373 (Fed. Cir. 2016), see Goal Zero Reply Br. 21–22, is similarly misplaced.  That case involved the corroboration of an AFA rate applied to an individually examined mandatory respondent, not the corroboration of a NME-wide rate applied to a respondent that had failed to rebut the presumption of government control.  See Papierfabrik August Koehler SE v. United States, 843 F.3d 1373, 1376 (Fed. Cir. 2016).

The Court of Appeals for the Federal Circuit held that Commerce properly corroborated its selection of a petition rate where Commerce explains why the petition rate continues to be relevant.  Ad Hoc Shrimp Trade Action Comm. v. United States, 802 F.3d 1339, 1360 (Fed. Cir. 2015).  Here, Commerce explained the continued reliability of the rate by referencing individual margins for Suntech in this proceeding.  See Final Decision Memo at 17.  The Court of Appeals for the Federal Circuit further stated that the availability of lower calculated dumping margins for cooperating respondents that have demonstrated eligibility for a separate rate does not render a higher calculated rate based on AFA for the China-wide entity uncorroborated.  See Ad Hoc Shrimp Trade Action Comm. v. United States, 802 F.3d at 1361.

[23]  As already discussed, where appropriate, the court shall require the exhaustion of administrative remedies.  19 U.S.C. § 2637(d).  The doctrine allows Commerce to "apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review," see Carpenter Tech., 30 CIT at 1374–75, 452 F. Supp. 2d at 1346 (citing Woodford v. Ngo, 548 U.S. at 88–90), before the court steps in to review Commerce's determination.

methodological differences between the rates calculated in the petition and prior

segments of the proceeding and the calculated rates in this administrative review.[24]  See

id. at 5–10.  The purpose of the exhaustion requirement would not be served by reviewing

the reliability of the rates Commerce used to corroborate based upon methodological

distinctions without Commerce having the opportunity to make a determination, finding,

or conclusion on those challenges.

## II.  Surrogate Value Data

SolarWorld challenges Commerce's selection of import data under Thai HTS

heading 7604 to value Yingli's aluminum frames inputs, see SolarWorld Br. 14–21, and

Commerce's use of world polysilicon prices to value semi-finished polysilicon ingots and

blocks purchased by Yingli, see id. at 21–25, as unsupported by substantial evidence.

SolarWorld also challenges Commerce's determination to offset selling, general, and

administrative ("SG&A") expenses by income labeled in its surrogate profit ratio

calculation.  See id. at 42–44.  The court first reviews Commerce's selection of SV data

for aluminum frames and next reviews Commerce's selection to value semi-finished

polysilicon ingots and blocks.  Thereafter, the court turns to Commerce's adjustments to

its surrogate profit ratio calculation.

---

[24] In its case brief, Goal Zero challenged the AFA rate as uncorroborated on the basis that: (1) it was not representative of the rates of the individually investigated respondents, see Goal Zero Adm. Case Br. at 5; (2) Commerce should have corroborated the AFA rate with transaction-specific margins specific to respondents in this review, including the review-specific margins of Yingli, see id. at 7–8; and (3) the selected rate did not reflect commercial reality because the calculated AFA is many times greater than the rate calculated for the mandatory respondent and separate rate respondents, see id. at 9.

### A. Aluminum Frames

SolarWorld argues that Commerce unreasonably selected import data for Thai HTS subheading 7604.29, which includes "Aluminum bars, rods and profiles: Other" because the import data under this category is not specific to aluminum solar frames. SolarWorld Br. 14–21.  Specifically, SolarWorld argues that the aluminum solar frames purchased by Yingli "have been further manufactured and processed into a good" that can no longer be considered a profile and has assumed the character of a different heading.  Id. at 19.  Defendant responds that Commerce reasonably concluded that import data under HTS heading is the best available information to value the frames purchased because it is most specific to the aluminum solar frames purchased by Yingli, which Yingli describes as "non-hollow, aluminum profiles."  Def.'s Resp. Br. 36–40.  For the reasons that follow, Commerce's selection of import data under HTS subheading 7604.29 is supported by substantial evidence.

In cases involving imports from NME countries, Commerce obtains a normal value by adding the value of the FOPs used to produce the subject merchandise and "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  19 U.S.C. § 1677b(c)(1).  Commerce values the FOPs "based on the best available information regarding the values of such factors in a market economy country or countries."  Id.  Commerce's methodology for selecting the best available information evaluates data sources based upon their: (1) specificity to the input; (2) tax and import duty exclusivity; (3) contemporaneity with the period of review; (4) representativeness of a broad market average; and (5) public availability.  See Import Admin., U.S. Dep't

Commerce, <u>Non-Market Economy Surrogate Country Selection Process</u>, Policy Bulletin

04.1 (2004), <u>available at</u> http://enforcement.trade.gov/policy/bull04-1.html (last visited

Jun. 23, 2017) ("<u>Policy Bulletin 04.1</u>"); Prelim. Decision Memo at 28.

Here, Commerce concluded that import data under HTS subheading 7604.29,

covering "aluminum alloy bars, rods and profiles, other, other than hollow profiles, other"

is the best available information to value aluminum frames purchased by Yingli because

the data is more specific to Yingli's solar frames than import data under HTS subheading

7616.99, covering "articles of aluminum nesoi."   Final Decision Memo at 81–82.

Commerce concluded that HTS heading 7604 is more specific than HTS subheading

7616.99 because HTS 7616.99 is "an 'other' category that includes products dissimilar to

aluminum frames," <u>id.</u> at 81, including "'nails, tacks, staples, screws, bolts, nuts, screw

hooks, rivets, cotters, cotter pins, washers, knitting needles, bodkins, crochet hooks,

embroidery stilettos, safety pins, other pins and chains, and cloth, grill and netting of

aluminum wire.'" <u>Id.</u> at 84.  Therefore, Commerce reasonably determined that import data

under HTS heading 7604 is more specific because SolarWorld points to no evidence

indicating that Yingli's aluminum frames are more similar to the products in HTS heading

7616 than those in HTS heading 7604.

SolarWorld's claim that HTS heading 7604 only includes items that are unfinished

and Yingli's frames have become finished products is unavailing.  First, the notes to

Chapter 76 state that profiles include products that "'have been <u>subsequently worked after</u>

<u>production</u> . . . provided that they have not thereby assumed the character of articles or

products of the other headings.'"  <u>See</u> Final Decision Memo at 82–83 (emphasis in

original, quoting Jiangsu Jiasheng Photovoltaic Technology, Co. v. United States, 38 CIT

__, __, 28 F.Supp.3d 1317, 1337 (2014)).   Further, it is reasonably discernible from

Commerce's reference to the International Trade Commission's definition of aluminum

profiles as "cast sintered, and worked after production," Final Decision Memo at 82, that

the work performed on the profiles highlighted by SolarWorld is not sufficient to make

Yingli's profiles more similar to the finished products enumerated in a different

subheading.[25]    SolarWorld points to no evidence detracting from Commerce's

determination.[26]

SolarWorld also argues that Commerce unreasonably concluded that Yingli's

aluminum frames were "profiles" because profiles must have a uniform cross section.

SolarWorld Br. 19–20 (citing the Notes to Chapter 7 of the HTS).  SolarWorld suggests

---

[25] SolarWorld emphasizes the following processing steps, which it argues are [[

        ]] to render Yingli's solar frames a finished product classifiable in another subheading:

[[

                                                                                        ]]. See SolarWorld

Br. 15–16.

[26] Commerce concluded that the Customs and Border Protection ("CBP") rulings placed on the
record do not support the notion that aluminum frames that have been subsequently worked after
production cannot be included in HTS heading 7604.  SolarWorld argues that "CBP does not
classify finished, 'ready to use' goods, such as frames for solar panels, in 7604."  Reply Br. Pl.
SolarWorld Americas, Inc. Confidential Version 7–8, Feb. 16, 2017, ECF No. 99 (citing SolarWorld
Submission of Factual Information and Submission of Information to Value [FOPs] at Ex. 3, CD
491–512, bar codes 3241320-01–22 (Nov. 10, 2014) ("SolarWorld SV Comments")).  Although
the CBP ruling cited by SolarWorld states that the aluminum frames, which Commerce classified
under HTS 7616.99 are not further processed, nothing in CBP's determination indicates that it
relies upon that fact.  See SolarWorld SV Comments at Ex. 3.  Moreover, Commerce notes that
another CBP ruling cited by SolarWorld classified aluminum frame sets under HTS category
8541.90.  See Final Decision Memo at 83.  It is reasonably discernible that Commerce determined
that this conflicting ruling, which Commerce notes SolarWorld has not argued Commerce should
follow, detracts from any claim that CBP relied upon the notion that frames were finished to
conclude that they were classifiable under HTS subheading 7616.99.  See id.

that Yingli's profiles are not uniform along their entire length.  Id. at 20 (citing Yingli's

Response to the Department's Fourth Section D Supplemental Questionnaire at Ex. D-

30, CD 428–430, bar codes 3232605-01–03 (Oct. 1, 2014) ("Yingli 4th Suppl. Sec. D.

Resp.")).  However, Commerce's task is not to classify the solar frame inputs used by

Yingli for customs purposes, but to select the best available data to value the FOPs in

question.  SolarWorld offers no evidence that calls into question Commerce's conclusion

that the processing performed by Yingli leaves its solar frames more similar to the

unfinished items included in HTS heading 7604 than the dissimilar finished items included

in HTS subheading 7616.99.  Therefore, Commerce's determination is supported by

substantial evidence.

### B.  Semi-Finished Ingots and Blocks

SolarWorld challenges Commerce's determination to value Yingli's semi-finished

ingots and blocks input with the world market price for polysilicon, claiming that price does

not reflect the substantial additional processing that polysilicon must undergo to become

an ingot or block.  See SolarWorld Br. 23–25.  Defendant responds that Commerce's

selection is reasonable because there was no surrogate value data for ingots and blocks,

and because additional processing was captured elsewhere in Commerce's calculations.

See Def.'s Resp. Br. 40–41.  For the reasons that follow, Commerce's determination is

supported by substantial evidence.

As already discussed, Commerce selects the best available information to value

FOPs by evaluating data sources based upon their: (1) specificity to the input; (2) tax and

import   duty   exclusivity;   (3)   contemporaneity   with   the   period   of   review;   (4)

representativeness of a broad market average; and (5) public availability.  See Policy

Bulletin 04.1; Prelim. Decision Memo at 28.  Here, Commerce determined that, because

no party submitted a SV for ingots and blocks, the world market price was the best

information available to value ingots and blocks purchased by Yingli.  Final Decision

Memo at 76.  Commerce noted that the inputs in question are primarily composed of

polysilicon.  Id.  Further, because Yingli self-produces most of its ingots and blocks,

Commerce could account elsewhere in its calculations for the additional processing costs

to turn polysilicon feedstock into ingots and blocks.  Id.  Therefore, Commerce determined

that no reliable record evidence suggests that the world market price for polysilicon would

result in unrepresentative pricing for ingots and blocks.[27]  Id.

SolarWorld contends that Commerce's use of a price for polysilicon fails to capture

all the costs associated with the ingots and blocks.  No party submitted SV data for ingots

and blocks and additional manufacturing is required to transform polysilicon into ingots

and blocks.  Id.  Yet, Commerce concluded that additional manufacturing costs were

already accounted for because "Yingli self-produces most of its ingots and blocks."  Id.

Commerce found further adjustments unnecessary.  Id.  However, SolarWorld claims that,

because evidence on the record indicated that Yingli purchased a significant portion of

the blocks consumed in the production of subject merchandise, Commerce erroneously

---

[27] Commerce declined SolarWorld's suggestion that it compare Yingli's market economy purchases of ingots and blocks to the SV generated from its SV data selection for valuing ingots and blocks because it concluded that its market economy purchases are not necessarily representative of industry-wide prices available to other producers.  Final Decision Memo at 76. SolarWorld points to no evidence to undermine Commerce's conclusion that the market economy purchases of polysilicon ingots and blocks were unrepresentative of industry-wide prices.

concluded that the additional processing costs required to manufacture ingots and blocks were accounted for elsewhere in the calculation.[28]   SolarWorld Br. 24 (citing Yingli's Response to the Department's Section D Questionnaire, Including Related Appendices at Exh. D-5, CD 173–176, bar codes 3201697-01–04 (May 13, 2014)).   However, the data relied upon by SolarWorld does not undermine Commerce's conclusion that the agency accounted for processing costs required to manufacture the ingots and blocks for most merchandise.   Yingli highlights record evidence demonstrating that the total purchases of ingots and blocks relative to the volume of ingots and blocks consumed during the period of review ("POR") was not significant.[29]   See Oral Arg. 01:21:22–01:24:36, May 5, 2017, ECF No. 129 (comparing Yingli 4th Suppl. Sec. D. Resp. at Revised Exh. D-7 (outlining consolidated purchases by Yingli entities of monocrystalline and polysilicon blocks and ingots during the POR) with Yingli 4th Suppl. Sec. D. Resp. at Exh. D-20 (outlining total

---

[28] SolarWorld highlights evidence showing the extent of Yingli's market economy purchases relative to its total purchases of blocks.  SolarWorld Br. 24.  SolarWorld argues that Yingli's responses to Commerce's Section D Questionnaire demonstrate that its "purchases of [[


          ]]."  Id.  An examination of the record evidence relied on by SolarWorld reveals that the exhibit contains spreadsheets reflecting only market economy purchases and not total purchases of ingots and blocks by Yingli and related entities.  See Yingli's Response to the Department's Section D Questionnaire, Including Related Appendices at Exh. D-5, CD 173–176, bar codes 3201697-01–04 (May 13, 2014).  However, the share of market economy purchases of ingots and blocks says nothing about the fraction of overall purchases of ingots and blocks.

[29] At oral argument, Yingli highlighted record evidence demonstrating that Yingli purchased just [[     ]] percent of total polysilicon blocks and [[      ]] percent of total polysilicon ingots used during the POR.  See Oral Arg. 01:21:22–01:24:36, May 5, 2017, ECF No. 129 (citing Yingli 4th Suppl. Sec. D. Resp. at Revised Exh. D-7 (outlining consolidated purchases by Yingli entities of monocrystalline and polysilicon blocks and ingots during the POR); Yingli 4th Suppl. Sec. D. Resp. at Exh. D-20 (outlining total consolidated quantities of ingots and blocks consumed by Yingli entities during the POR)).

consolidated quantities of ingots and blocks consumed by Yingli entities during the POR)).

It is reasonably discernible that Commerce considered the imperfect nature of the

surrogate value, noting that no party had submitted SV for ingots and blocks that were

purchased, and reasoned that it had chosen "the best SV information on the record to

value Yingli's ingots and blocks" because it had accounted for most of the additional

processing costs.  See Final Decision Memo at 76.  Although SolarWorld claims that the

record contained information to allow Commerce to add processing costs onto the value

of polysilicon to build up a price for these inputs,[30] see SolarWorld Br. 23–24, the

availability of another methodology does not make Commerce's determination

unreasonable given the record evidence.

Lastly, SolarWorld argues that Yingli's market economy purchases demonstrate

that the SV chosen by Commerce is aberrational.  See SolarWorld Br. 25.  Commerce

cited its practice, which is not to use a respondent's market economy purchase prices as

benchmarks because those prices are specific to one respondent and not necessarily

representative of industry-wide prices available to other producers.  Final Decision Memo

---

[30] Specifically, SolarWorld claims that "Commerce could have started with its [SV] for polysilicon and [[

                 ]]."  SolarWorld Br. 23.  Yingli points to several issues with SolarWorld's suggested approach including: (1) assuming that Yingli self-produced all of the ingots and blocks consumed would overvalue a substantial number of its purchased ingots; and (2) Commerce lacks data for inputs valued on a proper basis to make the suggested adjustment.  See Resp. Def.-Intervenors, Yingli Green Energy Holding co., Ltd., et al. Opp'n Pl's Rule 56.2 Mot. J. Agency R. Confidential Version 13, Jan. 1, 2017, ECF No. 89.  Although Commerce does not reference these specific issues, it is reasonably discernible from Commerce's observation that the SV selected would account for processing costs for most of the ingots and blocks used in production that Commerce favored an approach that would lead to the least distortion.  See Final Decision Memo at 76. Commerce's determination is therefore supported by substantial evidence.

at 76.  It is reasonably discernible from Commerce's statement that most of the ingots

and blocks used by Yingli in production are self-produced that Commerce considered the

small scale of Yingli's market economy purchases to be a weak indicator of industry-wide

pricing.  See id.  SolarWorld points to no evidence that Yingli's market economy

purchases were more representative in this case to justify a deviation from Commerce's

cited practice, which is not to use a respondent's market economy purchase prices as a

benchmark to determine if a surrogate value is aberrational.  See id. (citing Issues and

Decision Memorandum for the 2003–2004 [ADD] Administrative Review: Certain Cased

Pencils from the [PRC], A-570-827, 8 (July 6, 2006), available at

http://ia.ita.doc.gov/frn/summary/prc/E6-10568-1.pdf (last visited Jun. 23, 2017) (stating

that pricing data can be selectively obtained and does not serve as a basis for evaluating

whether other pricing from other data sources is unreliable)).

### C.  Calculation of Surrogate Financial Profit Ratio to Include "Other Income"

SolarWorld challenges as unsupported by substantial evidence Commerce's

deduction of a line item labeled "Other Income" in the financial statements of PT Len

Industri (Persero) ("PT Len"), an Indonesian producer of electrical equipment including

solar modules, whose financial statements Commerce selected to calculate respondents'

surrogate financial profit ratio.  See SolarWorld Br. 43–44; see also Prelim. Decision Memo

at 33.

As already discussed, Commerce obtains a normal value in NME cases by adding

the value of the FOPs used to produce the subject merchandise and "an amount for

general expenses and profit plus the cost of containers, coverings, and other expenses."

**PUBLIC VERSION**

19 U.S.C. § 1677b(c)(1).   Neither the statute nor Commerce's regulations further define

how Commerce is to calculate its surrogate financial profit ratio.   Nonetheless, as a matter

of practice, Commerce typically offsets a company's SG&A expenses by any income

related to the general operations of the company for the current period, when calculating

the surrogate profit ratio.  <u>See</u> Final Decision Memo at 60; 1,1,1,2-Tetrafluoroethane from

the [PRC]: Issues and Decision Memorandum for the Final Determination of Sales at Less

Than Fair Value [ADD] Investigation, A-570-998, 46–47 (Oct. 14, 2014), <u>available at</u>

http://ia.ita.doc.gov/frn/summary/prc/2014-24903-1.pdf  (last  visited  Jun.  23,  2017)

("1,1,1,2 Tetra from PRC I&D").   Here, Commerce offset the SG&A expenses in the

surrogate profit ratio calculation with the "other income" line item on PT Len's financial

statements.  <u>See</u> Final Decision Memo at 60.  Commerce explained that the "other income"

line item consists of "foreign exchange," "interest from bank," and "interest income," which

are among the types of expenses that it normally allows to offset SG&A expenses.  <u>Id.</u>

(citing SolarWorld Submission of Factual Information at Ex. 24 at 524, CD 491–512, bar

code 3241320-01–22 (Nov. 10, 2014) ("SolarWorld Factual Info.")).   Commerce further

explained its determination by referencing its practice in NME cases of assuming that

unassigned income relates to a company's general operations, absent evidence indicating

that such income relates to a specific expense.  <u>Id.</u> (citing 1,1,1,2 Tetra from PRC I&D at

46–47).  SolarWorld claims that no record evidence indicates that the sums deducted were

overhead expenses normally deducted by Commerce.   <u>See</u> SolarWorld Br. 43.   Yet,

SolarWorld does not challenge the reasonableness of Commerce's practice, nor does it

point to record evidence indicating that the "other income" line item relates to a specific

expense unrelated to PT Len's general operations.  Here, not only does Commerce point to record information indicating that the "other" income line item was grouped with line items that are attributable to general overhead, but Commerce also points to record evidence indicating that PT Len actually treated the "other income" line item as income attributable to the general operations of the company.[31]  Final Decision Memo at 60. Therefore, Commerce's determination is supported by substantial evidence.

### III. Suntech's CEP Sales

The court first addresses SolarWorld's challenge to Commerce's inclusion of Suntech's U.S. sales to an affiliated party as CEP sales in its calculation of Suntech's dumping margins.  See SolarWorld Br. 25–33.  The court next addresses SolarWorld's alternative challenge, which argues that Commerce inappropriately determined the date of sale for Suntech's reported CEP sales.  See id. at 29–32.

### A.  Treatment of Suntech's Sales to U.S. Affiliate as CEP Sales

SolarWorld argues that Commerce lacked substantial evidence to include sales to an affiliated party in Suntech's margin calculation.  SolarWorld Br. 25–33.  Defendant

---

[31] Commerce references record evidence indicating that the "other income" line item was used in determining profit before income tax, to explain why treating PT Len's "other income" line item as overhead expenses was consistent with the agency's practice of attributing such items to general operations.  Final Decision Memo at 60.  SolarWorld argues that Commerce provides no cite to the record indicating where it obtained this information.  See SolarWorld Br. 44.  Defendant clarifies that Commerce is referring to PT Len's financial statements, which demonstrate that "the amount for 'other income' (22,350,878,864) was added to operating profit when calculating profit before income tax."  Def.'s Resp. Br. 51 (citing SolarWorld Factual Info. at Ex. 24 at 489). Although Commerce should have referenced the specific record evidence supporting its determination to allow SolarWorld to verify the accuracy of its finding, it is reasonably discernible from the specificity of Commerce's reference in its final determination that its determination is based on the record evidence highlighted by Defendant.  See Final Decision Memo at 60.

responds that Commerce properly calculated CEP based on the price at which subject

merchandise was first sold in the United States by Suntech's affiliated seller to an

unaffiliated customer.  Def.'s Resp. Br. 42–44.  For the reasons that follow, Commerce's

inclusion of Suntech's sales as CEP sales is in accordance with law and supported by

substantial evidence.

Commerce determines the dumping margin by calculating the amount by which

the normal value exceeds the export price or CEP of the subject merchandise.  19 U.S.C.

§ 1677(35)(A).  CEP is the price, subject to certain adjustments, "at which the subject

merchandise is first sold (or agreed to be sold) in the United States before or after the

date of importation by or for the account of the producer or exporter of such merchandise

or by a seller affiliated with the producer or exporter" to an unaffiliated purchaser.  19

U.S.C. § 1677a(b).  Here, Commerce classified sales made by Suntech's affiliated seller

after the date of importation to the first unaffiliated customer as CEP sales.  Final Decision

Memo at 92–93.  Suntech reported the price and quantity of modules sold to an

unaffiliated purchaser and Commerce could verify those terms against documentation

provided by Suntech.[32]  Id.  Commerce also determined that it could make the required

adjustments under the statute to CEP.  Id.

---

[32] Commerce recognized that Suntech identified sales during the POR using an [[
                                        ]], a Suntech affiliate, generated by Suntech America,
Inc. on the date it shipped subject merchandise directly to [[                              ]], the
unaffiliated customer, and not through an invoice issued by Suntech America, Inc. directly to
[[                          ]].  Comments in the Issues and Decision Memorandum Containing
Business Proprietary Information at 12, CD 583, bar code 3289927-01 (July 7, 2015).  However,

(footnote continued)

SolarWorld claims that the unaffiliated party paid the affiliated party for the installation of a completed solar farm (a "turnkey solar project").  SolarWorld Br. 25–30. SolarWorld points to evidence indicating that the terms for this turnkey solar project were fixed terms.  Id. at 31.  There was no indication that the cost of solar modules was negotiated or priced separately.[33]  See id.  Therefore, SolarWorld argues that the record evidence relied upon by Commerce cannot support its determination that the sales prices for modules to Suntech's affiliate were identical to the sales price for modules to the unaffiliated customer.  See id.  However, Commerce found that the gross unit price for the modules was verified in parts of the contract between Suntech and the unaffiliated purchaser.[34]  See Comments in the Issues and Decision Memorandum Containing Business Proprietary Information at 12, CD 583, bar code 3289927-01 (July 7, 2015).

---

Commerce considered these transactions to reflect sales to [[                                    ]] because the price and quantity reflected in the invoice to the unaffiliated purchaser are identical to the invoice issued by [[                                    ]], Suntech's affiliate, to [[                                    ]]. See id.  Commerce also found that it could verify the price paid in each stage of the transaction against the terms of the contract, the parties to which were Suntech America, Inc. and [[                                    ]], including [[                                    ]] in the contract.  Id.

[33] SolarWorld focuses on record evidence demonstrating that the terms of the transaction between [[                    ]] and [[                                    ]] provided for payment of [[                                    ]] for construction of the completed solar project.  SolarWorld Br. 31 (citing Supplemental Section C Questionnaire Response – Wuxi Suntech Power Co., Ltd. at Ex. 3, CD 518–523, bar codes 3245430-01–05 (Dec. 4, 2014)). Therefore, SolarWorld contends that the payments made under the contract reflect a [[                                    ]] agreed to pay for the solar project, which included billings for ancillary services such as installations, and not a specific negotiated price for solar modules.  Id.

[34] Commerce found the gross unit price for the modules is [[                                    ]] between [[                    ]] and the unaffiliated purchaser [[                    ]].  See Comments in the Issues and Decision Memorandum Containing Business Proprietary Information at 12, CD 583, bar code 3289927-01 (July 7, 2015).  Moreover, Commerce noted that the gross unit module price is linked to [[                                    ]], which is part of the contract.  Id.

SolarWorld points to no record evidence detracting from Commerce's determination that the price and quantity reflected in the invoice to the unaffiliated purchaser are identical to the invoice issued by Suntech's affiliate to the purchaser.[35]   Therefore, Commerce's inclusion of module sales by Suntech's affiliate to its unaffiliated customer as CEP sales is supported by substantial evidence and in accordance with law.

### B.  Determination of Date of Sale for Suntech's Reported Sales

SolarWorld also challenges as unsupported by substantial evidence Commerce's use of the date of shipment rather than the date of contract for Suntech's reported CEP sales of solar modules to its unaffiliated purchaser.   See SolarWorld Br. 33–39. Defendant responds that Commerce supported its determination with record evidence showing that the material terms of the contracts were subject to change up to the date of shipment, which was also consistent with usual solar industry contract pricing practices, including those of Suntech.  Def.'s Resp. Br. 45–47.  The court agrees with SolarWorld that Commerce's determination is not supported by substantial evidence because the record evidence relied upon by Commerce reflects a transaction for the supply of solar modules, not a contract for the provision of a turnkey solar project.   On remand, Commerce must explain what record evidence supports a determination that the key terms of the sales between Suntech's affiliated seller and the purchaser were subject to change after the contract date or must reconsider its determination.

---

[35] SolarWorld's speculation that the module prices contained in the contract and invoices provided to verify those prices are the result of [[                                                      ]] contract price for the solar farm is unsupported by record evidence.  See SolarWorld Br. 32.

As already discussed, the statute provides that CEP is the price at which merchandise is "first sold (or agreed to be sold) before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter." 19 U.S.C. § 1677a(b).  The statute does not define when a product is deemed sold, nor does it define how Commerce determines date of sale for purposes of determining what sales should be included in calculating CEP for the POR.  See id.  Commerce's regulations provide that Commerce "normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business" as the date of sale.  19 C.F.R. § 351.401(i).  However, Commerce has discretion to use an alternative date if it determines that "a different date better reflects the date on which the exporter or producer establishes the material terms of sale."  Id.

Here, Commerce determined that a date other than the date of invoice reflects the date that the material terms of sale were established.  Final Decision Memo at 93. Commerce justified this determination by referencing contracts on the record for the sale of solar modules that are subject to change, id. (citing Section A Questionnaire Response – Wuxi Suntech Power Co., Ltd. at Ex. 16, CD 120–122, bar code 3196404-01–03 (Apr. 18, 2014)), and referencing its findings in past proceedings regarding contract pricing practices within the solar industry that are subject to change.  Id. (explaining that "the Department's knowledge of solar industry contract pricing practices, including those of Wuxi Suntech, indicates that the material terms of its contracts are subject to change.").

Commerce relies upon language in specific contracts of sale for solar modules in separate transactions, unrelated to the sales it included as CEP sales, to support its finding that Suntech America, Inc.'s contracts with purchasers are generally subject to change after they are executed.    However, SolarWorld contends that the specific contracts between Suntech and its unaffiliated purchaser that were included as CEP sales include payment for services other than the sale of solar modules.[36]   See SolarWorld Br. 36 (citing Supplemental Section C Questionnaire Response – Wuxi Suntech Power Co., Ltd. at Ex. 3, CD 214–218, bar codes 3209510-01–02, 3209387-01–03 (Jun. 16, 2014) ("Suntech Suppl. Sec. C Questionnaire Resp.")).   Commerce does not explain why it is reasonable to conclude that specific language in a contract that reflects only the sale of solar modules lends support for an interpretation of a contract for services other than the sale of solar modules.  Further, SolarWorld points to specific language in the contract for the sales included as CEP sales to support its claim that the terms of the contract were fixed as of the date of contract.[37]   Id. at 37.   Commerce failed to explain why its determination that these contracts are subject to change is reasonable in light of the

---

[36] Specifically, Commerce found that the contract reflects that [[


]].  See SolarWorld Br. 36 (citing Supplemental Section C Questionnaire Response – Wuxi Suntech Power Co., Ltd. at Ex. 3, CD 214–218, bar codes 3209510-01—02, 3209387-01–03  (Jun. 16, 2014)).

[37] SolarWorld points out that there is specific language in the contract affirmatively indicating [[
]], see SolarWorld Br. 37 (citing Suntech Suppl. Sec. C. Questionnaire Resp. at Ex. 3 at Art. 5.5), and indicating that [[
]].  See id. (citing Suntech Suppl. Sec. C. Questionnaire Resp. at Ex. 3 at Art. 5.1).

affirmative language in the specific contract underlying the transaction included as CEP

sales.  On remand, Commerce must do so or reconsider its determination.

### IV. Use of FOP Data of Certain Suntech Tollers

SolarWorld contends that Commerce's acceptance of FOP usage data from

Suntech and certain tollers in place of missing data from relevant toll processors was not

supported by substantial evidence.[38]  SolarWorld Br. 39–42.  Defendant responds that

Commerce reasonably determined that the FOP usage data reported by Suntech and

certain of its tollers could serve as a substitute for the missing FOP data and that it was

appropriate to use facts otherwise available without an adverse inference because record

evidence indicated that Suntech cooperated to the best of its ability.  Def.'s Resp. Br. 49–

50.  For the reasons that follow, Commerce's determination is supported by substantial

evidence.

Commerce shall determine the normal value of subject merchandise exported from

a NME country on the basis of the value of FOPs, to which Commerce shall add an

amount for general expenses and profit plus the cost of containers, coverings, and other

expenses.  19 U.S.C. § 1677b(c)(1).  The valuation of FOPs "shall be based on the best

available information regarding the values of such factors in a market economy country

or countries considered to be appropriate by [Commerce]."  Id.  Therefore, the statute

gives Commerce discretion in assessing what the best available information for valuing

---

[38] Commerce found that Suntech entities obtained certain wafers, coated glass, insulative strips, junction boxes, and modules/laminates from toll processors.  See Memorandum re: Unreported Factors of Production at 1, CD 585, bar code 329025-01 (July 7, 2015).

FOPs and in calculating a normal value for subject merchandise in NME cases.  See id.
To make the applicable determination, Commerce shall generally apply facts otherwise
available on the record in reaching an applicable determination if: (1) information
necessary to Commerce's administrative determination is not available on the record; (2)
an interested party withholds information requested or fails to provide the information in
a timely fashion or in the form and manner requested; (3) significantly impedes a
proceeding; or (4) provides information but the information cannot be verified.  See 19
U.S.C. § 1677e(a).  The statute permits Commerce to use an inference that is adverse to
the interests of a party in selecting from among the facts otherwise available if Commerce
finds that an interested party has failed to cooperate by not acting to the best of its ability
to comply with a request for information.  19 U.S.C. § 1677e(b).

        Here, Commerce acknowledged that Suntech was unable to provide the requested
FOP consumption data for all of its tollers.  Final Decision Memo at 40.  Commerce
accordingly determined that it was appropriate to apply facts available to calculate
Suntech's FOP usage.  See id. at 40–41.  Commerce justified its exercise of discretion to
decline to apply an adverse inference to Suntech's FOP consumption by recounting
Suntech's efforts to cooperate and act to the best of its ability to comply with Commerce's
request for such data.  See id. at 41.

        Moreover, Commerce noted that its practice is to use FOP information from tollers
as a substitute for missing FOP data where: (1) a respondent has a number of tollers; (2)
a respondent identifies tollers in a timely manner; (3) a respondent documents its
unsuccessful efforts to obtain FOPs from its tollers; and (4) non-reporting tollers account

for only a small portion of FOPs and there is usable FOP information from other suppliers

that could serve as a substitute for the missing FOPs.  See Final Decision Memo at 40–

41.  Commerce found that Suntech had a large number of tollers and that Suntech

identified those tollers in a timely manner.[39]  Id. at 40.  Commerce also found that Suntech

documented its unsuccessful efforts to obtain the requested data from its tollers.  Id. at

41 (citing Memorandum re: Unreported Factors of Production, CD 585, bar code 329025-

01 (July 7, 2015) ("Unreported FOP Memo")).  Commerce also justified its reliance on the

tollers' FOP data together with data provided by Suntech because it found that the non-

reporting tollers accounted for a small portion of FOPs.[40]  Final Decision Memo at 41.

Therefore, Commerce's determination to follow its practice of using FOP information from

---

[39] Specifically, Commerce noted that Suntech identified over [[   ]] tollers for the relevant FOPs in a timely manner.  Memorandum re: Unreported Factors of Production at 7, CD 585, bar code 329025-01 (July 7, 2015).

    For module/laminate toll processors, Commerce noted that Suntech identified its tollers in response to Commerce's initial questionnaire.  Id. at 3.  Commerce also reviewed that Suntech identified additional module/laminate tollers in response to its supplemental questionnaires.  Id.

[40] Commerce specifically noted that the wafers processed by Suntech's wafer toll processors accounted for [[   ]] percent of the total quantity of wafers consumed in the production of subject merchandise during the POR.  Unreported FOP Memo at 2.  However, Commerce found that Suntech produced subject merchandise from "purchased (i.e., finished, nontolled") wafers." Id.  Commerce found that purchased wafers represent [[   ]] percent of the total quantity of wafers consumed in the production of subject merchandise during the POR.  Id.  Thus, Commerce noted that "[Suntech] has either FOP data or wafer consumption quantities for [[   ]] percent of wafers consumed in the production of merchandise under consideration during the POR."  Id. at 2–3.

    For modules/laminates, Commerce found that the modules/laminates processed by the two tollers that responded to Suntech's FOP usage data requests represent [[   ]] percent of the total quantity of modules/laminates produced during the POR.  Id. at 3.  Commerce noted that Suntech reported usage data for its own self-production of modules/laminates, which represents [[   ]] percent of the total quantity of modules/laminates produced during the POR.  See id.  Therefore, Commerce found that the information submitted reflected FOP data for [[   ]] percent of all modules/laminates produced during the POR.  Id.

Suntech, as well as cooperating tollers, as a substitute for missing FOP data from tollers used by Suntech is supported by substantial evidence.[41]  See id. at 40.  Commerce also explained that it determined not to apply an adverse inference to Suntech's FOP usage for non-reporting tollers because Commerce concluded that Suntech had acted to the best of its ability in complying with Commerce's request for the information.  See id. SolarWorld points to no evidence undermining Commerce's conclusion.

SolarWorld argues that Commerce's use of Suntech's own FOP data, for modules/laminates, as a substitute for missing unaffiliated tollers' data is unreasonable because the unaffiliated tollers would likely have higher costs.  SolarWorld Br. 40. SolarWorld argues that no record evidence indicates that a toll processor would have similar per-unit costs to that of a large integrated producer like Suntech.  See id.  However, SolarWorld points to no evidence on the record that supports its suggestion that a relatively small producer of modules/laminates would have higher per-unit costs than a large integrated producer like Suntech.  Nor does SolarWorld support its assertion that

---

[41] Generally, Commerce did not use Suntech's own FOP data as a substitute for missing FOP data.  See Final Decision Memo at 41.  However, for modules/laminates, Commerce accepted Suntech's own FOP data together with that of the reporting tollers as a substitute for the missing FOP data.  Id.  Although SolarWorld expresses concern that data from Suntech may differ from the missing toller data, see SolarWorld Br. 40–42, SolarWorld points to no evidence in the record of discrepancies in FOP usage between Suntech's FOP usage and that of its responding tollers or among the responding tollers to support its concerns.  Moreover, Commerce also justified its determination that the missing information did not significantly affect the representativeness of the data used as facts available because Suntech purchased approximately [[        ]] percent of the total quantity of wafers consumed and self-produced approximately [[        ]] percent of the total quantity of modules/laminates produced during the POR.  See Unreported FOP Memo at 7. Commerce also notes that the non-reporting tollers individually supplied [[        ]] percent of wafers consumed and [[        ]] percent of modules/laminates produced during the POR.  Id.  Therefore, Commerce's determination to use the FOP data reported by Suntech as facts available was supported by substantial evidence.

Commerce's acceptance of data for modules laminates would have meaningfully affected

Commerce's margin calculation.[42]   See id.   Without such affirmative evidence of a

disparity between the missing costs, the court cannot say that Commerce's determination

is unsupported by substantial evidence.[43]

Finally, SolarWorld argues that Commerce's decision to accept Suntech's own

FOP data for modules/laminates in place of its toll processors presents a significant risk

for manipulation. SolarWorld Br. 41.   However, Commerce notes that Suntech not only

reported its own FOP data, but also reported data from cooperating unaffiliated tollers of

modules.   Unreported FOP Memo at 3.   It is reasonably discernible that Commerce

concluded, based on the absence of discrepancies in tolling data between the reporting

---

[42] SolarWorld points out that more than [[     ]] percent of modules/laminates consumed by Suntech were produced by unaffiliated toll processors.  SolarWorld Br. 40.  This fact alone does not undermine Commerce's conclusion that the missing data would not have materially affected its margin calculation given Commerce's explanation that the non-reporting tollers supplied a "limited portion of the quantity" of these inputs used during the POR.  See Unreported FOP Memo at 7.  SolarWorld points to no data undermining Commerce's conclusion.

[43] SolarWorld contends that Commerce's determination incorrectly relied on Suntech's supply of actual consumption quantities for all raw materials provided to module/laminate toll processors.  See SolarWorld Br. 40–41.   SolarWorld claims that "some raw material costs for the module/laminate toll processors may not have been reflected at all in the FOPs reported by Suntech" because Suntech admitted that unaffiliated tollers may have provided materials other than those supplied by Suntech.  Id. at 41.  SolarWorld's argument is premised on the notion that Commerce accepted FOP data because Suntech provided consumption quantities for raw materials provided to the toll processors for the [[     ]] percent of modules/laminates produced by unaffiliated toll processors.  See id. (citing Unreported FOP Memo at 3).  However, it is reasonably discernible that Commerce accepted the data from Suntech and its unaffiliated module/laminate tollers because Commerce concluded that the data provided by Suntech, which provided FOP data for [[     ]] percent of all module/laminates produced during the POR, was representative of the experience of the non-responding tollers and not because it had complete data for the remaining [[     ]] percent of modules/laminates.  See Unreported FOP Memo at 3.  Therefore, Commerce did not rely upon Suntech's supply of actual consumption quantities for all raw materials provided to module/laminate toll processors.

tollers and the small proportion of module production for which it lacked data, that the data supplied could serve as a substitute for the missing data.  Where SolarWorld cannot point to a discrepancy in the data actually produced which would render it unreasonable for Commerce to accept this data, the court cannot say that Commerce's determination is unreasonable.

## CONCLUSION

The court remands Commerce determination to use the date of shipment rather than the date of contract for Suntech's reported CEP sales of solar modules to its unaffiliated purchaser for further consideration and explanation.  The court sustains the Final Results in all other respects.  In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Final Results are remanded for further consideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination within 45 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on Commerce's remand redetermination; and it is further

**ORDERED** that the parties shall have 15 days thereafter to file replies to comments on the remand redetermination.

 /s/ Claire R. Kelly  
Claire R. Kelly, Judge

Dated: June 28, 2017
         New York, New York